IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DUKE ENERGY FIELD SERVICES, L.P.,

   Plaintiff,

v.                   CV 05-1342 WPL/RLP

GANDY CORPORATION,

   Defendant,

consolidated with

GANDY CORPORATION,

   Plaintiff,

v.                   CV 06-0318 WPL/CEG

DUKE ENERGY FIELD SERVICES, L.P.,
AND ALL UNKNOWN CLAIMANTS,

   Defendants.

**MEMORANDUM OPINION AND ORDER
DENYING GANDY CORPORATION'S MOTION
TO EXCLUDE THE TESTIMONY OF RON MILLER**

  In this breach of contract and fraud case, Duke Energy Field Services retained Ron Miller, a certified public accountant, to testify concerning the amount of damages it sustained as a result of alleged overcharging by Gandy Corporation when it was hauling liquid hydrocarbons (slop oil) removed from Duke Energy's pipeline system by tanker truck. Gandy has filed a motion to exclude testimony from Miller on the ground that the factual basis for Miller's testimony and his methodology are not scientifically valid. (Doc. 57.) This Order will deny Gandy's Motion.

  Miller reviewed various types of information to arrive at his opinions. Duke Energy provided

Miller with 45 months of invoices, truck tickets and Driver Duty Status Records (DDSRs) from Gandy. The DDSRs contain two components: a top half which contains a graph where Gandy's truck drivers track their hours working and not working pursuant to Department of Transportation (DOT) Hours of Service regulations, and a bottom half which contains spaces where Gandy's drivers record the number of hours billed to Duke Energy for the services provided. Miller was also provided with data prepared by Rick Kaiser, an investigator retained by Duke Energy to review Gandy's records to determine if Gandy had been overcharging Duke Energy. Miller assigned a numerical value for each day in the 45 month period, and then selected 15% of the data for analysis. Miller and his staff extracted from Kaiser's data the date, bates number, driver's name, truck number and trailer number, the DOT hours and the hours charged to Duke Energy. Miller and his staff examined the relevant DDSRs to ensure that Kaiser's data correctly reflected the number of hours worked, the number of hours charged to Duke Energy, and the difference between those hours. Miller also examined Gandy's truck ticket and invoice related to each DDSR, although Gandy disputes that Miller examined all available truck tickets and invoices. Miller "spot-checked" Duke Energy's Supervisory Control and Data Acquisition (SCADA) system data to determine whether his estimates of Duke Energy's damages were reasonable. Miller reviewed depositions taken in this case, and took a field trip on July 12, 2006 from Gandy's yard in Lovington to several booster stations, the Eunice Oil Center and back to Gandy's yard in an attempt to understand the processes, procedures and time frames for a Gandy driver to pick up and deliver slop oil in the field.

    Miller's Damage Report compares the DOT hours recorded on the top half of the DDSRs to the number of hours billed to Duke Energy recorded on the bottom half of the DDSRs, and estimates

that Gandy overcharged Duke Energy the sum of $796,550.[1] Miller prepared a Supplemental Damage Report which took into account a two hour minimum charge allowed to Gandy under the Master Service Agreements. The supplemental report estimates that Gandy overcharged Duke Energy from $496,583.54 to $505,282.30.

Gandy pursues a multi-prong approach in its quest to preclude Miller from testifying, arguing that (1) the schedule used by Miller did not accurately allocate hours between work performed for Duke Energy and work performed for other companies, (2) Miller did not take into account the two hour minimum charge allowed Gandy under the Master Service Agreements, (3) Miller did not consider that some of Gandy's hauls were exempt from the DOT hours of service rules, (4) the log hours reflected on the schedule do not identify what work Gandy performed for other companies or the terms under which such work was performed, (5) Miller ignored the testimony from Gandy's drivers that they under-reported their DOT hours so that they could continue to drive, (6) Miller's schedule contains mathematical and compilation errors, (7) Duke Energy's SCADA system data is not accurate and reliable and Miller erred in considering this data, (8) Miller's method of sampling Gandy's data for a 45 month period and computing damages for a period of 63 months is contrary to professional standards, and (9) Miller's opinion on damages is unreliable because it keeps changing.

When faced with a proffer of scientific testimony, the trial court is to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology [] can be applied to the facts in issue." *Daubert v.*

---

[1] Miller also computed a range of damages under the New Mexico Unfair Practices Act. Since I have already determined that Oklahoma and Colorado law apply to this dispute (Doc. 94), I need not discuss further Miller's estimates of damages available under New Mexico law.

*Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993); FED. R. EVID.702. *Daubert* set forth a non-exclusive list of factors for use by trial courts in assessing the reliability of scientific testimony, which include (1) whether the expert's technique or theory can be and has been tested, (2) whether the technique or theory "has been subject to peer review and publication[,]" (3) "the known or potential rate of error" of the technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) whether the technique or theory has been generally accepted in the scientific community. *Id.* at 593-94. Other courts have considered whether (1) the expert developed his opinion expressly for the purpose of testifying, or whether the testimony grows naturally out of research conducted independent of the litigation, (2) "the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion[,]" (3) "the expert has adequately accounted for obvious alternative explanations[,]" (4) the expert is employing the same level of intellectual rigor in the courtroom "that characterizes the practice of an expert in the relevant field," and (5) "the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." FED. R. EVID. 702 advisory committee's note to 2000 Amendments; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). No single factor is necessarily dispositive, and the trial court's inquiry is flexible and the focus is primarily on the principles and methodology, not the conclusions generated. *Daubert*, 509 U.S. at 593-95; *Kumho*, 526 U.S. at 150-53.

In a *Daubert* hearing, a party need not prove that his expert is indisputably correct or that his theories are "generally accepted" in the scientific community. *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (quoting *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999)). Instead, the party must show, by a preponderance of the evidence, that the methods employed by his expert in reaching his conclusions are scientifically sound and that their opinions are "based on facts

which satisfy Rule 702's reliability requirements." *Id*.; FED. R. EVID. 702 advisory committee's note to 2000 Amendments. Given the capabilities of juries to understand scientific evidence and weigh the credibility of competing experts, and the liberal thrust of the rules of evidence, any doubts regarding the admissibility of scientific evidence should be resolved in favor of admission, rather than exclusion. *Daubert*, 509 U.S. at 588-89, 595-96. The traditional methods of attacking shaky but admissible evidence are "[v]igorous cross-examination, presentation of contrary evidence, and careful instructions on the burden of proof . . . ." *Id*. at 596. As the Seventh Circuit noted, "Trials would be very short if only perfect evidence were admissible." *Indianapolis Colts, Inc. v. Metro. Baltimore Football Club*, 34 F.3d 410, 416 (7th Cir. 1994).

Duke Energy vigorously defends the reliability of the facts relied upon by Miller in reaching his conclusions and the methodology he used. In response to Gandy's claims that Miller did not accurately allocate hours between work performed for Duke Energy and work performed for other companies, Duke Energy notes that Miller eliminated from his sample any Gandy DDSRs that showed Gandy drivers working for companies other than Duke Energy. Gandy admits that Miller considered the two hour minimum charge allowed Gandy under the Master Service Agreements in his supplemental report, although it contends his supplemental report is still in error.

Gandy's primary objection is that Miller based his damage estimates on the DOT hours reported by Gandy's drivers on the top half of the DDSRs, instead of the actual hours worked by Gandy's drivers that are reflected on the bottom half of the DDSRs. Gandy asserts that it is undisputed that its drivers under-reported their DOT hours, and that Miller's testimony is subject to exclusion under *Daubert* because Miller cannot rely on Gandy's DOT hours. In contrast, Duke Energy claims that Jon Gandy admitted that the DOT hours shown on Gandy's DDSRs were the

5

actual number of hours worked by Gandy's drivers.

The requirement in Rule 702(1) that expert testimony be based on "sufficient facts or data" calls for a quantitative rather than a qualitative analysis. FED. R. EVID. 702 advisory committee's note to 2000 Amendments. When facts in a case are in dispute, experts will sometimes reach different conclusions based on competing versions of the facts. *Id*. The emphasis in Rule 702(1) on "sufficient facts or data" is "not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." *Id*. An expert's opinion must find some support in the record for the facts assumed, and weaknesses in the factual basis of an expert's opinion goes to the weight to be given to the evidence, not to its admissibility. *Marvin Lumber and Cedar Co. v. PPG Indus., Inc.*, 401 F.3d 901, 916 (8th Cir. 2005); *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 800-01 (6th Cir. 2000). Because there is some testimony in the record that supports Miller's reliance on the DOT hours, Miller's testimony on this issue is admissible. Gandy's first seven challenges to Miller's testimony are all challenges to the factual basis for his testimony, and go to the weight to be accorded Miller's testimony at trial, not its admissibility.

Two of Gandy's complaints, that Miller sampled Gandy's data for 45 months but computed damages for 63 months, and that Miller's opinion on damages is unreliable because it keeps changing, are not challenges to the factual basis for Miller's opinions. I need not hold a separate *Daubert* hearing to assess these challenges to Miller's testimony. Trial courts have substantial flexibility in deciding how to test an expert's reliability. *Kumho*, 526 U.S. at 152; *Goebel v. Denver & Rio Grande Western R.R. Co.*, 346 F.3d 987, 990 (10th Cir. 2003) (the trial court has broad discretion "in deciding how to assess an expert's reliability, including what procedures to utilize in

making that assessment").

The primary purpose of *Daubert* is to protect juries from confusing and unreliable expert testimony, and these concerns are lessened in a bench trial, where the court must evaluate the evidence regardless of whether the court ultimately decides to exclude it. *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1301-02 (Fed. Cir. 2002). Trial courts conducting bench trials have the flexibility to admit proffered expert testimony and then decide during the course of trial whether the evidence meets the requirements of Rule 702. *United States v. Brown*, 279 F.Supp.2d 1238, 1243 (S.D. Ala. 2003) (quoting *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 635 (6th Cir. 2000) (Gilman, J., dissenting)). Judge Posner has expressed the view that since the primary purpose of *Daubert* is to protect juries from being

> bamboozled by technical evidence of dubious merit . . . . In a bench trial it is an acceptable alternative to admit evidence of borderline admissibility and give it the (slight) weight to which it is entitled. The Federal Circuit in *Seaboard Lumber*, . . . while pointing to the concern with protecting juries from confusion, did say that the *Daubert* standard must be followed in bench trials as well. But it did not say that it must be followed *rigidly* in such trials. *Daubert* requires a binary choice – admit or exclude – and a judge in a bench trial should have discretion to admit questionable technical evidence, though of course he must not give it more weight than it deserves.

*SmithKline Beecham Corp. v. Apotex Corp.*, 247 F.Supp.2d 1011, 1042 (N.D.Ill. 2003) (Posner, J., sitting by designation), *aff'd on other grounds*, 403 F.3d 1331 (Fed.Cir. 2005).

Gandy's *Daubert* challenges to Miller's testimony based on an inadequate or faulty basis are denied. It will be Gandy's responsibility at trial to attack the bases for Miller's testimony through cross-examination of Miller and presentation of its own experts. Because this is a non-jury trial, Gandy's other *Daubert* challenges to Miller's testimony are denied at this time. I will allow Miller to testify and will decide during trial or afterwards whether his testimony satisfies the requirements

of Rule 702. If it does I will give Miller's testimony the weight to which it is entitled, and if it does not I will grant Gandy's *Daubert* motion and will strike it.

   IT IS SO ORDERED.

*[signature: William P. Lynch]*

William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.